**Elsie ALEXANDER, Individually, and as Guardian of Larry Alexander, Plaintiff,**

v.

**PATHFINDER, INC.; Colleen Black, Executive Director of Pathfinder, Inc., Individually and In Her Official Capacity; Cindy Crook, Administrator of Pathfinder Home, Individually and in Her Official Capacity; and Tom Dalton, In His Official Capacity as Director of Arkansas Department of Human Services, Defendants.**

**No. LR–C–95–616.**

United States District Court, E.D. Arkansas, Western Division.

Oct. 27, 1995.

---

5. Defendants' request for oral argument on this issue is denied.

Cecilia Ryker Seay, Theresa Lynn Harmon Caldwell, Little Rock, AR, for plaintiff.

Billy S. Clark, Friday, Eldredge & Clark, Little Rock, AR, for Pathfinder, Inc., Colleen Black, Cindy Crook.

Breck G. Hopkins, Arkansas Department of Human Services, Office of General Counsel, Little Rock, AR, for Tom Dalton.

## ORDER

HENRY WOODS, District Judge.

This case involves the discharge of a 32-year old man, Mr. Larry Alexander, from Pathfinder, Inc., an Intermediate Care Facility for the Mentally Retarded ("ICF/MR"). Pathfinder is duly licensed by the Arkansas Department of Human Services, Office of Long-Term Care, and receives Medicaid funds. Pathfinder decided to discharge Mr. Alexander in April, 1995. Mrs. Elsie Alexander, mother and legal guardian of Mr. Alexander, opposes the discharge. The decision to discharge Mr. Alexander was the subject of a hearing before the Department of Human Services. After a six-day hearing, at which both parties were represented by counsel, the hearing officer concluded that Pathfinder was not equipped to deal with Mr. Alexander's physical conditions and that the discharge had been made for good cause and not in retaliation for Mrs. Alexander's complaints about Mr. Alexander's treatment at Pathfinder. The Findings and Conclusions of the hearing officer are attached hereto as Exhibit A.

Mrs. Alexander did not exercise her right to appeal that decision to the Circuit Court of Pulaski County, Arkansas. Subsequently, Mrs. Alexander filed the instant suit seeking relief from this Court.

Mr. Alexander became a resident of Pathfinder in May, 1993; previously he lived at the Alexander Human Development Center

in a "total care" unit. Mr. Alexander suffers from an array of physical problems in addition to being severely mentally retarded as a result of Down's syndrome. He has sleep apnea, chronic esophagitis, chronic gastritis/reflux, asthma, and environmental allergies. His condition is worsened by his morbid obesity, which is a result of Pickwickian syndrome.[1]

The hearing officer found that Pathfinder "reluctantly" admitted Mr. Alexander and that he was admitted "with the understanding that if [Pathfinder's] services proved insufficient to meet [Mr. Alexander's] needs [Pathfinder] would recommend a more appropriate placement." (Findings and Conclusions of Hearing Officer, p. 3.) The hearing officer found that the frequency of Mr. Alexander's illnesses and the need for medical intervention had increased sharply from the time he was first admitted to Pathfinder to the present.

The question before the Court is whether the plaintiff can relitigate the issues which were adjudicated, or could have been adjudicated, in the administrative hearing on Mr. Alexander's discharge from Pathfinder. Stated another way, can Mrs. Alexander avoid the limited review of the determination made in the administrative hearing and opt instead for a trial *de novo* in federal court?

■ In *University of Tennessee v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), the Supreme Court of the United States addressed the question of the preclusive effect of state administrative adjudications. The Court held that, as a general rule, federal courts must give an agency's factfinding the same preclusive effect to which it would be entitled in the state's courts, except for specific types of cases, discussed *infra*. Before giving such preclusive effect, a federal court must determine that: (1) the administrative agency was acting in a judicial capacity; (2) the issues litigated were properly before agency adjudicator; and (3) the parties before the administrative adjudicator were afforded a full and fair opportunity to litigate the issues. *Id.* at 797–98, 106 S.Ct. at 3225–26. These require-

ments are, of course, in addition to the settled requirements for application of the doctrine of res judicata, or issue preclusion:

> Res judicata bars relitigation of a claim if: (1) the prior judgment was rendered by a court of competent jurisdiction; (2) the prior judgment was a final judgment on the merits; and (3) the same cause of action and the same parties or their privies were involved in both cases.

*Lunde v. Helms*, 29 F.3d 367 (8th Cir.1994), quoting *Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir.), *cert. denied*, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990).

The *Elliott* Court cited important policy reasons for applying common law preclusion to administrative determinations:

> The law of res judicata, much more than most other segments of law, has rhyme, reason, and rhythm—something in common with good poetry. Its inner logic is rather satisfying. It consists entirely of an elaboration of the obvious principle that a controversy should be resolved once, not more than once. The principle is as much needed for administrative decisions as for judicial decisions. To the extent that administrative adjudications resemble courts' decisions—a very great extent—the law worked out for the court does and should apply to agencies.

*Id.* at 798 n. 6, 106 S.Ct. at 3226 n. 6, quoting 4 K. Davis, Administrative Law Treatise § 21.9, p. 78 (2d ed. 1983). The Court also quoted from the Restatement (Second) of Judgments, noting its similar conclusion:

> Where an administrative forum has the essential procedural characteristics of a court, ... its determinations should be accorded the same finality that is accorded the judgment of a court. The importance of bringing a legal controversy to conclusion is generally no less when the tribunal is an administrative tribunal than when it is a court.

*Id.* at 798 n. 6, 106 S.Ct. at 3226 n. 6, quoting § 83, p. 269, Restatement (Second) of Judgments (1982).

■ There are two notable limits or exceptions to the application of common law

---

**1.** Pickwickian syndrome refers to a condition of compulsive and chronic overeating.

principles of res judicata to agency decisions. First, Congress may decide that "other values outweigh the policy of according finality to state administrative factfinding." *Elliott,* at 799, n. 7, 106 S.Ct. at 3226, n. 7. This is the case with claims brought under Title VII [2] and the Age Discrimination in Employment Act (ADEA).[3] There is no preclusive effect given to agency findings in suits brought under Title VII and the ADEA.

Although administrative estoppel is favored as matter of general policy, its suitability may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures. [Citations omitted] The presumption here is thus properly accorded sway only upon legislative default, applying where Congress has failed expressly or impliedly to evince any intention on the issue.

*Astoria Federal Savings & Loan Association v. Solimino,* 501 U.S. 104, 109–10, 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991). The *Astoria* Court found that the filing requirements in the ADEA made it obvious that Congress did not intend for federal courts to give preclusive effect to administrative findings with respect to age discrimination. *Id.* at 110, 111 S.Ct. at 2171.

■ Second, administrative determinations are given only the preclusive effect that the decision would be entitled to in the state's own courts. *Elliott,* at 799, 106 S.Ct. at 3226. Had the plaintiff appealed in state court the determination by the agency concerning Mr. Alexander, she would have been confined to the record before the agency, A.C.A. § 25–15–212(g), unless "application [had been] made to the court for leave to present additional evidence and the court [had found] that the evidence [was] material and that there were good reasons for failure to present it in the proceeding before the agency...." A.C.A. § 25–15–212(f). The administrative findings could have been reversed or modified only if found to be: "(1) In violation of constitutional or statutory provisions; (2) In excess of the agency's statutory authority; (3) Made upon unlawful procedure; (4) Affected by other error or law; (5) Not supported by substantial evidence of record; or (6) Arbitrary, capricious, or characterized by abuse of discretion." A.C.A. § 25–15–212(h).

■ Beyond peradventure, each of the *Elliott* requirements for preclusion are present in this case. Furthermore, all of the elements required for issue preclusion generally, set out *supra,* are present. These parties were afforded the opportunity to fully and fairly try each and every claim in this lawsuit. The Arkansas Administrative Procedure Act, A.C.A. § 25–15–201 *et seq.,* specifically provides for challenging a decision on the ground that a decision violates constitutional or statutory provisions. A.C.A. § 25–15–212(h)(1). The agency hearing in this case took place before a hearing officer who, while hired by the agency, was an independent contractor. *See Deretich v. Office of Administrative Hearings,* 798 F.2d 1147 (8th Cir.1986) (Plaintiff was given adequate opportunity to litigate his grievances in state agency proceedings. Preclusive effect would be given to the findings of the hearing examiner in light of fact that there was an independent hearing examiner who spent five days hearing the grievances and issued a fifty-six page advisory opinion.) The Alexander hearing lasted six days, resulting in a 1,400 page transcript, excluding exhibits. The parties were permitted to call witnesses, to offer exhibits, and to cross-examine witnesses. Each issue raised in this lawsuit was litigated in the agency hearing, including the incident of alleged abuse, the taping of telephone conversations between Mrs. Alexander and personnel at Pathfinder, the purpose and reasonableness of the behavior modification plan for Mr. Alexander, and the allegation that Mr. Alexander's discharge was in retaliation for Mrs. Alexander's complaint's about her son's care at Pathfinder.

The hearing officer found that Pathfinder was not an appropriate placement for Larry

---

**2.** "... Congress did not intend unreviewed state administrative proceedings to have preclusive effect on Title VII claims." *Elliott,* at 796, 106 S.Ct. at 3225.

**3.** *Astoria Federal Savings & Loan Association v. Solimino,* 501 U.S. 104, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991).

Alexander in spite of the testimony of Mr. Alexander's treating physicians, whom the hearing officer found to be "more concerned with whether Larry [Alexander] would be admitted to a nursing home rather than whether [Pathfinder] is an appropriate placement." (Findings and Conclusions of Hearing Officer, p. 12.) The hearing officer also found that, although Mrs. Alexander and the personnel at Pathfinder had numerous conflicts and disagreements about Mr. Alexander's treatment, both Mrs. Alexander and Pathfinder had his best interest at heart. In other words, their goals and hopes for Mr. Alexander were the same; they disagreed on how best to reach their mutual goals for Mr. Alexander.

 The hearing officer concluded that certain federal regulations did not apply to Mr. Alexander's discharge and that other federal regulations did apply. The agency's interpretation of federal law, as opposed to its findings of fact, are not entitled to deference. I have reviewed the relevant federal statutes and regulations *de novo*. Federal regulations clearly differentiate between skilled nursing facilities and intermediate care facilities, such as Pathfinder. Requirements for discharging a patient from a nursing facility (i.e. a nursing home) are found in Subpart B, Part 483, Subchapter E, Chapter IV of Title 42. Subpart B specifically excludes Intermediate Care Facilities such as Pathfinder.

 The requirements for discharging a resident under Subpart B are considerably more stringent than those for facilities covered by Subpart I, which governs Intermediate Care Facilities, such as Pathfinder. Subpart I requires that Intermediate Care Facilities document that the resident was discharged for "good cause." 42 CFR § 483.400. Given the preclusive effect of the findings of fact made by the hearing officer, only one conclusion is reasonable: Larry Alexander was discharged from Pathfinder for good cause. The facts adduced at the administrative hearing leave no doubt that he required considerably more medical care than other residents and that there was a marked

change in his medical condition—or at least the medical care required to maintain his health—over the two years he lived at Pathfinder. There was no violation of any applicable federal regulation in Mr. Alexander's discharge.

 Furthermore, the finding that the discharge was reasonable and necessary precludes the claim, brought under the Americans With Disabilities Act ("ADA"),[4] that Mr. Alexander was discriminated against in public accommodations on the basis of his disability. Since the plaintiff cannot relitigate the issue of reasonableness of the decision to discharge, she cannot prevail on a theory that Pathfinder unreasonably denied him accommodations.

 The ADA was never intended to prevent a facility, whose "customers" are *all* disabled, from limiting the scope of the services it provides to the disabled. Surely all facilities cannot be required to serve disabled individuals with every degree of disability. If that were the case, it would require abandonment of designations such as "intermediate care" and "total care." As noted, federal regulations are replete with such distinctions; it cannot have been the intent of Congress to prohibit the specialization of facilities which care for the disabled. The purpose of the A.D.A., as with all federal statutes barring discrimination, is to ensure opportunity to take part. The A.D.A. affords disabled persons, "the opportunity ... to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." That is to say, disabled persons must be afforded the option to avail themselves of the *services offered* by an entity. What it does *not* do is force an entity to provide extraordinary services which it is not set up to deliver. 42 U.S.C. § 12182(b)(1)(A)(i). The A.D.A. guarantees a disabled person the right to be able to enter and dine in a restaurant which is open to the general public. It does not, however, require a Chinese restaurant to serve spaghetti. The complaint fails to state a claim under the A.D.A. For the same reasons, the complaint

4. 42 U.S.C. § 12181 *et seq.*

fails to state a claim under the Rehabilitation Act of 1973, 29 U.S.C. 794.

█ The hearing officer found that Pathfinder had put "the horse before the cart" in concluding that Mr. Alexander should be discharged for medical reasons before physicians had reached that conclusion. *See* A.C.A. § 20–10–1005(a)(1). Indeed the hearing officer found a technical violation of the Arkansas Statutes and regulations governing discharge of residents on the ground that the physicians' assessment and conclusion that a medical discharge was necessary came after the notice of discharge was sent. Nevertheless, the physicians' determination was made before the administrative hearing took place. Requiring Pathfinder to send a new notice, after physicians made a medical determination that discharge was warranted, would have elevated form over substance. The hearing officer's finding, and that of the physicians who testified for Pathfinder, is amply supported in the record.

Accordingly, on the grounds of issue and claim preclusion, this case must be, and hereby is, dismissed. Relief sought is denied. The Temporary Restraining Order is hereby dissolved.

## EXHIBIT A

### BEFORE THE ARKANSAS DEPARTMENT OF HUMAN SERVICES

### IN THE MATTER OF THE INVOLUNTARY DISCHARGE OF LARRY ALEXANDER

I.

### *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

*Background and Course of Proceedings*

Larry Alexander (Larry) is a thirty-two (32) year old male resident of the Pathfinder Homes ten-bed ICF/MR facility on Hospital Drive in Jacksonville, Arkansas. Pathfinder, Inc. owns and operates this facility—sometimes referred to at the hearing as the "HUD unit". The facility is duly licensed by the Arkansas Department of Human Services, Office of Long–Term Care and Path-

finder, Inc. (Path) receives Medicaid funds in exchange for the care provided residents at the HUD unit. Path also operates other ICF/MR's in central Arkansas and has its principal offices in Jacksonville.

ICF/MR's are Intermediate Care Facilities for the Mentally Retarded. As described at the hearing and in Path's Brief these facilities—including the HUD house—are twenty-four hour skilled care facilities, although the skilled care provided is not as intensive as that provided in a nursing home. For example, a nursing home provides twenty-four hour nursing care with a full-time R.N. on staff while ICF/MR's apparently do not provide same.

Elsie Alexander (Elsie) is Larry's mother and the legal guardian of his person and estate. She is a widow and lives in Jacksonville.

On April 17, 1995 Ms. Cindy Crook, the duly licensed Administrator of the HUD house wrote and sent a letter to Elsie informing her that Path intended to discharge Larry for medical reasons. Elsie appealed under the authority of A.C.A. 20–10–1005 by letter dated April 20, 1995. The undersigned was subsequently appointed hearing officer to consider Elsie's appeal. By agreement of the parties the hearing was postponed until July, 1995 so discovery could be conducted and cases prepared. The hearing commenced on July 11, 1995 and lasted six days in July and August. Numerous witnesses testified. Numerous and voluminous Exhibits were introduced. At the hearing officer's request the parties graciously agreed to allow until September 8, 1995 for a final decision.

It is Path's position the discharge is justified because Larry's welfare requires it and Path cannot meet his medical needs. Path has the burden of proof. On the other hand, Elsie asserts the discharge should be denied because Path has not complied with concededly applicable state regulations and because the purported reason for discharge is a pretext. Elsie also contends Path has failed to comply with disputedly controlling federal regulations. Based upon the evidence, arguments and other matters the hearing officer

makes and enters the following findings of fact and conclusion of law.

## II.

### FINDINGS OF FACT

1. At all relevant times Larry has had the following diagnoses:

a) Down's syndrome with severe retardation;

b) Morbid obesity;

c) Severe asthma and environmental allergies;

d) Sleep apnea;

e) Barrett's esophagitis;

f) Chronic gastritis/reflux;

g) Pickwickian Syndrome.

Larry's esophageal problems have become progressively worse in the last couple of years.

2. Larry was admitted to the HUD house in May, 1993. Path was fully aware of Larry's diagnoses at the time and "reluctantly" admitted him with the understanding that if Path's services proved insufficient to meet Larry's needs Path would recommend a more appropriate placement.

3. Prior to his admission as a HUD house resident, Larry had been a resident at the Alexander Human Development Center (AHDC). AHDC has a "total care" unit and Larry was in this unit. Such unit provides a more intensive level of care than Path does.

4. The AHDC refused to "transfer" Larry to Path because AHDC personnel did not believe Path was an appropriate placement. Instead, Elsie had to have AHDC discharge Larry. Path then admitted him.

5. While at AHDC Larry was subject to a behavior management program. The program allowed Larry to earn tokens for soft drinks and similar items. Elsie wanted to have Larry at the HUD house because it was closer to her home and Larry apparently disliked the AHDC.

6. Throughout his residence at both AHDC and the HUD house Larry has had trouble with his weight. All physicians agree Larry's obesity exacerbates his other physical problems.

7. During his first two months at the HUD house Larry gained eight pounds. At that point Path and its Interdisciplinary team recommended Larry be put on a behavior management plan to keep his weight down. Elsie agreed. The plan is somewhat similar to the AHDC plan but more restrictive. In effect, Larry earns "smiley faces" or suffers the penalty of "frowny faces". If at the end of the week he has too many "frowny faces" he is not allowed to have weekend visit with Elsie at her home.

8. On July 15, 1993 an incident occurred at the HUD house involving Larry. Elsie was called by Lonia Dednam (Toliver) in the evening. Ms. Dednam—the HUD house supervisor—informed Elsie that Larry had his bag packed and wished to go home. Elsie went to the HUD house and calmed Larry down. He remained there that night. The next day Elsie called the HUD house about taking Larry to see his physician—Dr. Valentin Stone. Elsie made an appointment with Dr. Stone for 2:00 p.m. and picked Larry up for that purpose. She took Larry home and discovered bruises on his back. Elsie notified Path of the bruises and indicated her belief that someone at the HUD house had abused Larry. Path had its employees on duty write up incident reports and reported the matter to the Jacksonville police department. Four representatives of Path went to see Elsie and Larry at Elsie's home and took photos of the bruises. These Path representatives (Cindy Crook, Colleen Black, Lonia Dednam, and Claudette Waddle)—or one of them—suggested Elsie pursue the matter with the police. Elsie refused because she didn't want to get anyone in trouble.

9. At some point during Larry's residence at the HUD house Elsie informed a Path official that its employees were being rude to her and using abusive language. Path employees at the HUD house accused Elsie of the same thing. Path officials instituted a taping system to tape Elsie's calls to Path and conversations with staff at the HUD house. Initially Elsie agreed to this in order to prove her allegations but she later

objected. Path continued to tape communications anyway.

10. From the beginning Larry's attending physician has been Dr. Valentin Stone. Path was notified of his status at or near the time of Larry's admission. But Dr. Stone is only the so-called "quarterback" of a team of physicians treating Larry for various problems. The sheer number of physicians treating Larry causes problems for Path. For example, Path has been instructed to call Dr. Stone—the attending physician—if Larry needs a physician. But if Dr. Stone is not available and Elsie cannot be reached Path has standing instructions to take Larry to the hospital emergency room. (The proximity of the HUD house to the hospital was one factor cited by Path witness Colleen Black for admitting Larry in the first place.) On one occasion the emergency room physician prescribed a medication that could have caused several problems for Larry—or even death. Had the Path nurse not realized the implications of administering the drug (Percocet) to a resident with sleep apnea it may have depressed Larry's system to the point that he stopped breathing.

11. During Larry's residence at the HUD house Path has had a "special" nurse come in during the evening hours to administer his medications. Larry takes around twelve to fifteen different medications. No other resident does so.

12. On one occasion HUD house staff—which monitors Larry's sleeping with a special device at this point—discovered Larry had stopped breathing during the night. He was awakened and resumed "normal" breathing.

13. The medical testimony is in sharp conflict. Those physicians retained by Elsie are of the opinion that Larry is well-placed at the HUD house and that a more intensive environment—such as a nursing home—is not necessary for Larry's welfare. On the other hand, Path's physician (a psychiatrist) opines that Larry should not be at the HUD house and believes Path is ill-suited to meet Larry's many and varied medical needs.

14. Drs. Stone and Kellar opine that Larry's condition—although serious—is stable and they discount the sleep apnea as a reason for intensified service.

15. In the latter part of 1994 Larry was admitted to the hospital with pneumonia and stayed there for four days. A couple of weeks later he was diagnosed with mild bronchitis. In December, 1994 he had an upper respiratory infection. In January, 1995 the possibility of surgery on Larry's esophagus was explored but rejected as too risky. In February, 1995 Larry was treated for bronchitis. In February, 1995 Larry was discovered to have stopped breathing while sleeping on one occasion and awakened to resume same. He was taken to Dr. Stone the following day. Dr. Stone said it was the sleep apnea problem and that Larry needed to be watched closely during the night.

16. At some point in February, 1995 Path officials received and reviewed a Medical Referral Sheet (Path Exhibit 3) which alarmed them. The officials were Cindy Crook, Administrator, and her superior, Colleen Black. Neither of them is a physician or nurse. Based upon this Sheet, Larry's medical diagnoses and perceived deteriorating condition, Ms. Black made the decision that Larry should be discharged. Ms. Black made this decision without consulting any of Larry's or Path's physicians.

17. Path officials subsequently contacted Elsie about transferring Larry to the Conway Regional Development Center and set up a meeting to discuss it. Although Elsie originally agreed to participate in the discussions she subsequently refused.

III.

### CONCLUSIONS OF LAW

At the outset I would like to commend the lawyers for their thoroughness of presentation and vigorous advocacy. As can plainly be concluded from the 1,400 page plus record of testimony (excluding depositions) and equally voluminous Exhibits the parties left no stone unturned in their efforts to produce evidence relating to their respective positions.

I wish I could be as detailed and thorough in this opinion. The statute, however, says I should render a ruling within seven (7) days—which expired on August 30, 1995. Had the parties not granted me until September 8 I would have been in a terrible fix. In view of the statutory intent I did not believe it wise to ask for even more time. In any event, I hope I have covered the "core" facts in the findings.

Keeping in mind that Path has the burden of proof to justify discharge I now turn to the issues. Path asserts discharge is proper to meet Larry's needs per A.C.A. 20–10–1005 and applicable regulations. A.C.A. 20–10–1005(a)(1) provides, in pertinent part, as follows:

(a) The Office of Long–Term Care shall prescribe through rule or regulation the procedure for transfer or discharge of residents to be followed by long-term care facilities. The procedure shall include:

(1) Provisions for a written notice to be furnished to the resident, sponsor, and other appropriate parties thirty (30) days prior to any involuntary transfer or discharge, and regulations setting forth the following circumstances for which the written notice need not be furnished:

(A) The transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility; . . .

Regulations adopted per the above statute are a part of the "Resident Rights" regulations which apply to 10 bed ICF/MRs:

353 A resident may be transferred or discharged only for; medical reasons; his welfare or the welfare of health of other residents; the resident presents a danger to safety or health of other residents; because the resident no longer needs the services provided by the facility; non-payment for his stay; or the facility ceases operation. The resident shall be given reasonable written notice to ensure orderly transfer or discharge.

353.1 The term "transfer" applies to the movement of a resident from facility to another facility.

353.2 *"Medical reasons"* for transfer or discharge shall be based on the resident's needs and *are to be determined and documented by a physician.* That documentation shall become a part of the residents permanent medical record.

353.3 "Reasonable notice of transfer or discharge" means the decision to transfer or discharge a resident shall be discussed with the resident and the resident will be told the reason(s) and alternatives available. A minimum of thirty (30) days written notice must be given. Transfer for the welfare of the resident or other residents may be affected immediately if such action is documented in the medical record. (Emphasis added)

It seems obvious to me that Path's attempt to discharge Larry by letter of April 17, 1995 violated regulation 353.2 because no one at Path consulted a physician prior to issuance of the letter. If a physician is not consulted about the determination of "medical reasons" prior to the decision to discharge, then the purpose of the above regulation has been frustrated. Deciding to discharge Larry and then seeking medical justification, as occurred in this case, puts the proverbial cart before the horse. (Perhaps Drs. Stone and Kellar could have assuaged Path's alarm in February or March, 1995 had they been contacted—I don't know. But once the decision was made and notice letter sent positions hardened and little done to reverse the decision.)

Next, should the violation of the regulation standing alone, be sufficient to justify sustaining Elsie's appeal? In other words, was the violation "harmless error" on Path's part? After all, a physician did determine Larry's discharge was appropriate for medical reasons in May, 1995 and the medical records and evidence about Larry's increased health problems in the latter part of 1994 and early 1995 seem to support his opinion.

Before addressing this issue I want to say I am convinced Path did not seek to discharge Larry in 1995 due to a 1993 complaint of alleged abuse. It is fairly clear both Path and Elsie have Larry's interests at heart despite the disputes between them over the behavior modification plan, the tape recorder

issue and other complaints Elsie would have me consider and conclude as evidence of efforts to get her to remove Larry from Path's care. It is just as reasonable to conclude, and it is so found, that:

a) The behavior management plan was suggested and approved by Elsie in an effort to control Larry's behavior;

b) The tape recording of Elsie's communications was instituted to attempt to find out if staff was using abusive language and the culprit or culprits, if any; and, ultimately

c) Path *did not* come up with a scheme or plan to make Elsie's life so miserable that she would remove Larry from Path's care.

Now, back to whether Path should be allowed to discharge Larry for "medical reasons".

Initially I would note it is my conviction the more strict federal regulations applicable to nursing homes do not apply to ten bed ICF/MRs. See 42 CFR Section 483.5 at definition of "facility"—which excludes ICF/MRs from the definition. Then see 42 CFR Section 483.12 which discusses discharge restrictions imposed upon a "facility". Finally, see 42 CFR Section 483.400 *et seq.* which discuss the "Conditions of Participation [in the Medicaid Program] for Intermediate Care Facilities for the Mentally Retarded"— which provide that a client may be discharged for good cause at 42 CFR Section 483.440(b)(4). See also the Arkansas Provider Manual for ICF/MR 15 Bed or Less Long Term Care Facilities at Regulation 607.1.

In view of the above Regulations concerning discharge standards for ICF/MRs ("good cause") with documentation in the client's record it is my belief the discharge of Larry should be allowed despite the technical failure of Path to have a physician's opinion prior to the discharge decision. (It could even be argued that the Resident Rights Regulation in question—353.2—conflicts with Regulation 607.1 and since the latter specifically addresses ICF/MRs it therefore controls.)

Larry's physical problems are many and interrelated. His weight problem, sleep ap-nea, reflux, asthma, environmental allergies and Barrett's esophagitis—when considered *in toto* and in conjunction with his recent medical history—pose unique daily living problems for which an ICF/MR is ill—equipped to handle.

And I reject the opinions of Larry's attending physicians. They seem more concerned with whether Larry would be admitted to a nursing home rather than whether Path is an appropriate placement. Path is not an appropriate placement for Larry. (I do not know what is but I am convinced Path is not.)

Based upon the medical records of Path, the diagnoses, the recent decline in Larry's health, the medical records of Larry's attending physicians, his pharmacological needs and other matters, I conclude that Path has established discharge for good cause and that its failure to consult a physician prior to issuance of the notice of discharge is an insufficient basis for denying discharge.

## IV.

### *ORDER*

**IT IS THEREFORE ORDERED** that the appeal of Elsie Alexander, legal guardian of Larry Alexander, from the April 17, 1995 Notice of Discharge be, and it hereby is, denied and disallowed. Ms. Alexander and her ward are allowed a reasonable period of time, not to exceed thirty (30) days, for placement at another facility. **IT IS FURTHER ORDERED** that Ms. Alexander's "Motion for Mistrial" is denied but that her Motion to Strike the Saline County Complaint appended to Path's post-hearing submission is granted.

**IT IS SO ORDERED.**

/s/ Jack East III
HEARING OFFICER
September 8, 1995
DATE